[No. 1270.]

PATTERSON AS RECEIVER OF THE COLO. SECURITIES CO. v. DeLONG ET AL.

1. CERTIFICATE OF PURCHASE OF STATE LAND BOARD—TITLE.
A certificate by the state land board of the purchase of land forms but an imperfect or inchoate title which cannot become perfect or complete until the contract of purchase be entirely completed, the consideration money paid, and the fee passed out of the state by grant to the grantee named in the contract.  But such imperfect or inchoate title is subject to incumbrance and transfer as fully and as freely as an absolute title, and the transferee of such title gets a good title coupled with the right to complete the purchase from the state by payment of the unpaid part of the purchase price.

2. CORPORATIONS — AUTHORITY OF OFFICER — PURCHASER WITH NOTICE—RIGHTS OF EQUITABLE OWNER.
The state land board sold to a corporation certain lands, issuing to the corporation a certificate of purchase which gave to the corporation a right to a patent upon payment of the balance of the purchase money.  The corporation mortgaged the land and the mortgage was foreclosed, the plaintiffs becoming the purchasers.  Afterwards H., the president of the corporation, transferred to B. the certificate of purchase in payment of an individual debt owing by H. to B.  B. paid to the state the balance of the purchase money, and procured a patent to the land to himself.  B. then transferred the land without consideration to other parties who, without consideration, mortgaged it to defendant, a loan company.  The president of the loan company, through whom the transaction was had, had knowledge of B.'s want of equity and assumed to pay to B. the amount of the debt owed to him by H.  *Held* that the transfer by H. to B. was without consideration, and that B. took the transfer charged with notice that H. as president had no authority to trans-

fer the property of the corporation in payment of his individual debts.    That the loan company acquired no better title than B. had, and that plaintiffs could maintain their bill to compel the conveyance to them of the legal title upon payment of the amount paid by B. to the state, with interest.

*Error to the District Court of Arapahoe County.*

Mr. JOHN R. SMITH, for plaintiff in error.

Mr. F. C. GOUDY and Mr. J. C. HELM, for defendants in error.

BISSELL, J., delivered the opinion of the court.

Departing somewhat from the usual custom in formulating this opinion, I shall first outline the general features of the controversy, and reserve the statement of many of the material facts to the discussion of the propositions on which our conclusions are based.

The case naturally proceeds along certain lines, and its chronological narration is the simplest plan for its decision. The origin of the title so far as respects these litigants is the first stage in its history.    The state owned a large quantity of land in the San Luis Valley, county of Costilla.    Much of the land was in the market and offered for sale by the government.    The eleven quarter sections involved formed a part of a very large body of some nearly 6,000 acres which were sold originally to the San Luis Valley Canal Company.    In deraigning the title through, under, and by which the defendants in error, DeLong and Brower, claim, it will be stated substantially as it appears from the complaint, because in these particulars its allegations stand admitted by the securities company's answer.    The San Luis corporation will hereafter be called the canal company, as contradistinguished from its successor in interest.    The canal company purchased on the 18th of February, 1884, at which date the state board of land commissioners, having authority and power to sell, contracted

with it with reference to this large tract of land. The contract not only provided for the sale and transfer of title at a price named, but obligated the canal company as a part of the consideration to construct a large canal and some laterals which would supply water to irrigate the quarter sections which were contracted to be sold, and the alternate sections to which the state reserved title. In the following May, the canal company gave a deed of trust on the land in dispute with other to John R. Hanna to secure 150 bonds of $500 each. The deed was recorded, and by its terms provided that in default of payment of the principal or interest on demand of the legal holder, the premises should be sold. In the following October, the company defaulted in payment, and the trustee Hanna sold the lands to one Cyrus Strong, and executed a trustee's deed for all the property, which was recorded on the 28th of October, 1886, in the proper records of Costilla county. In March, 1888, Strong sold these lands to Hanna and Dunbar, transferring title by warranty deed. Shortly afterwards, and in the same month, Hanna and Dunbar deeded to the San Luis Canal & Improvement Company, which held title until the events which will be subsequently narrated. This deed was recorded on the 27th day of April, 1888, in the proper records of the county. Being thus the owner, the improvement company, on the 22d day of March, executed a trust deed to Samuel N. Wood, as trustee, conveying the lands to secure four promissory notes which had theretofore been given by it to Cyrus Strong, the first three for $10,000 each, and the fourth for $13,000, payable in one, two, three and four years after date, with seven per cent interest. The deed was in the usual form, and authorized the trustee under certain conditions to sell. Wood afterwards resigned, and on the 21st of February, 1893, a default having been made in the payment of the notes and the interest, the premises were sold by the successor in trust designated in the deed, with full observance of the conditions specified in the instrument, and DeLong and Brower became the purchasers of the property for a valuable consideration, to wit: about $27,000.

Up to this time no reference whatever has been made to the evidence of title from the state held by the corporations or the individuals by whom it had been holden, and through whom it passed. The first written evidence of title exhibited by the record is the certificate of purchase given by the state and bearing date January 16, 1890, which recited the purchase by the San Luis Canal & Improvement Company on the 18th of February, 1884. According to the averments of the bill, the admissions of the answer, and the concessions of counsel, it is very evident that the recital of the purchase on the 18th of February, 1884, by the improvement company is a clerical error, and it should have been recited as purchased on that date by the canal company. This is wholly unimportant because the state manifestly sold to the canal company, it transferred to the trustees, who afterwards sold, and the certificate was issued to evidence the contract entered into between the canal company and the state, of which the improvement company became the subsequent holder by transfers of title which are unquestioned, and which on their face are sufficient to vest in the improvement company whatever rights were acquired under it, and the certificate was properly issued to this corporation. Neither this certificate nor any other was recorded prior to the time that the title of the parties who now claim an interest in the premises was put on record. We regard this as wholly unimportant since the certificate itself was in point of fact issued before third persons acquired any rights or interests whatever in the premises, and prior to the time of the foreclosure of the trust deed which had been executed by the last holders of the equitable title. We should have had considerable difficulty to resolve the questions presented by this and the subsequent occurrences, but for a decision of the supreme court, which, to our mind, has completely determined the matters which would have been otherwise debatable.

*Stewart v. McLaughlin*, 11 Colo. 458, fully settles the main propositions presented by the facts contained in this record. In the phraseology of that decision the title of the canal

company was an imperfect or an inchoate title, which could neither become perfect nor complete until the contract of purchase should be entirely completed, the consideration money paid, and the fee pass out of the state by grant to the grantee named in the contract. Nevertheless, this imperfect or inchoate title was subject to incumbrance and transfer as fully and as freely as an absolute title, and was subject to any limitations which might arise from the dealings of the parties. We then have at the date of the certificate, as well as at the date of the antecedent agreements and transfers, a title in the canal company and its transferees, on which the transfers might be operative, whereby, and through which, unless affected by the subsequent transactions, DeLong and Brower got a good title to the property coupled with the right to complete the purchase on the payment of the unpaid part of the consideration, and thus unite in themselves by means of the grant the inchoate and the perfect title, which would vest in them the fee. This right still exists, and the bill can be maintained on the proofs unless the evidence establishes in Barth or in the securities company an equity superior in right, if not prior in time, to that held by DeLong and Brower. The significance of Barth's connection with the title, and its relation to that of the securities company, will clearly appear from the subsequent discussion. These two parties are so intimately connected, and the infirmities of the one are so nearly and exactly the infirmities of the other, that the history of both are essential to the deduction and establishment of the character of the claim asserted by the securities company.

First in point of time and importance is Barth's title. We must ascertain what he got, where he got it, and the conditions under which he took title, and the notice with which he was charged because of these circumstances and conditions. We do not quite understand why the certificate which was transferred to Barth was not produced in evidence. It can readily be imagined that there might be on its face earmarks which would when stated make cogent argument in

support of what may be demonstrated by Barth's testimony
and the transaction by which he got title. This is only our
surmise, but we should have been very glad to have had an
inspection of it. It will be remembered the certificate of
purchase bore date the 16th of January, 1890, and recited a
purchase on the 18th of February, 1884, by the San Luis
Canal & Improvement Company. Running as it did to a
corporation, and having as it is claimed and admitted by the
pleadings and the proof been transferred by assignment to
Mr. Barth, it must have been transferred by the corporate
seal and over the signature of the proper corporate officers,
to wit : the president and secretary. Since this is true it fol-
lows when Mr. Barth took the assignment of that certificate
he took it with full notice that he was taking the property
of a corporation and that the transfer to be valid and effec-
tual as against it, must have been authorized by the directors
having authority to act, if not by the stockholders. We
should then naturally expect that at the time of the sale or
purchase, if such it was, Mr. Barth as a prudent business
man would have demanded the production of the resolution
under which the officers assumed to act, and have determined
by inquiry whether their acts were within the scope of their
authority and duly authorized by the body. In place of this,
we find according to his testimony that he was without
knowledge as to what persons were the officers of that corpo-
ration, nor did he know whether those who assumed to sign
and transfer nearly six thousand acres of land on which had
been spent from fifty to one hundred thousand dollars, had
authority and right to act. This of itself is a very significant
circumstance whereby he ought in equity to be held to have
had knowledge of any defects of power or authority for the
transfer. But beyond all this we find other testimony which
completely overshadows this in importance and significance.
When Mr. Barth took the assignment of this certificate he
paid no consideration whatever for it. Whether the assign-
ment of the certificate itself recites a consideration we are
not advised, but the testimony discloses the fact that he then

parted with nothing, and did not pay any money to the corporation or to any person for it save this; when he got the certificate he went to the proper state officers, paid the balance of the purchase price, to wit: the sum of twelve hundred and odd dollars, took the patent, and assumed that the grant from the state thus issued to him gave him a complete and perfect title. If it did, then have the courts of equity in modern times lost what we have hitherto conceived to be their very broad and ample powers. The only other thing which he paid, and we are quite at a loss to see how it can be treated as a payment, was a satisfaction of T. C. Henry's personal debt of $7,200. According to his testimony, he took the certificate, made the last payment, and took the grant simply for the purpose of collecting from Henry an individual debt of that amount. Manifestly this could not be treated as a consideration paid by him although he thereby succeeded in collecting what he probably esteemed a very doubtful debt. It was in no sense a payment, and in no sense a part of the consideration. It was however, complete notice to Mr. Barth that the man with whom he was dealing and who assumed to act as the president of the improvement company was attempting to transfer a title to the company's land in the payment of his individual debts. When this came to Mr. Barth's knowledge and to this he testified, he certainly took the title not as an innocent and *bona fide* purchaser for value, but as one who dealt with an officer who had in his possession the evidence of title to property belonging to a corporation, and who desired to transfer it in order to pay his individual debt, and therefore with notice, and under circumstances which in no manner gave him an equity superior to the claims of DeLong and Brower.

With this starting point, to wit: a title in Barth, which is neither legal nor equitable as against the company save to the extent of the money which he paid the state for the patent, we must now trace his title to the securities company, to see whether they got a better title than he had, and whether or not they were charged with notice. It is exceedingly unfor-

tunate of course that the sins of the officer must be visited on the corporation, and that Aldrich's evident fraud and connivance must result in injury to innocent stockholders and possibly innocent creditors. That the transaction was a fraud so far as Aldrich was concerned, and that he was a party and privy to it in connection with Henry, is as evident to my mind, as is the fact that the transaction was executed by him and by Henry in the manner which will be disclosed. Now let us proceed to ascertain what title the securities company have, and how they got it. In the first place, it will be remembered that the certificate of purchase was assigned to Mr. Barth under the narrated circumstances, that he got a patent from the state issued to himself upon the payment of a fraction of the consideration, and with knowledge of the fact that it was the improvement company's property and was obtained by him to secure a debt owed by one of the officers of that corporation. So far we are unable to determine directly from the record whether or not he made a deed of that patent title to the securities company. It is quite probable he did, though it does not clearly appear. The title of this eleven quarter sections, if it ever passed out of Barth at all, passed to Colt, Coulson and Swayze, who were employees under the control and direction of T. C. Henry, who with Aldrich was the apparent father of this deal. These three persons executed trust deeds on the various quarter sections for the sum of $1,250 on each quarter and the trust deeds and notes thus executed were turned over to Aldrich, who proceeded as he says to investigate the title. While they were thus in his possession, they were sent to be recorded. Up to this time, according to Mr. Barth's testimony, these persons had neither title nor evidence of title, but Aldrich to the end that his title might be secure and perfect on its face sends the deeds for record. Naturally, it would be inquired what did Colt, Coulson and Swayze pay for their title; we answer, nothing. According to the testimony they never parted with a dollar, and according to it likewise, they never got a dollar for the notes which they gave and the trust deeds

which they executed. They were mere conduits to whom the title passed, and through whom the security came, and this as will be remembered was all known to Mr. Aldrich and therefore to the securities company. He, as the president of the securities company had the trust deeds and the notes, and he knew that the title had not been conveyed by Mr. Barth. At the time they executed the paper, he knew and Barth knew that these persons were not to receive the money represented by the notes and the securities. This is deduced from the circumstance that when the transaction came to be completed between Barth and Aldrich and Henry, and the quit-claim deeds made from Barth to Colt, Coulson, and Swayze and the transfer of these securities to Aldrich, it was all done at one and the same time. Barth then executed the quit-claim deeds, Aldrich and the securities company had the trust deeds and the notes, and Aldrich paid Barth by note $7,200 plus another sum of $4,600 which was paid in cash at the bank to protect certain acceptances which had been theretofore given to N. P. Hill. We are not advised by anything in the record as to what those acceptances were, nor for what they were given, or whose debts they represented nor anything whereby we are able to assume, or from which we have a right to presume that they represented the actual consideration to the improvement company, to Colt, Coulson, or Swayze, or to anybody who had a right to receive the money, unless it happened to be some other creditor of Mr. T. C. Henry's. Another circumstance must be noted and that is that this $7,200 was not paid in cash to Mr. Barth, nor was any cash paid to anybody for the title, but Mr. Aldrich or the securities company, either one or both, we do not care which, gave a note at ninety days to Mr. Barth for this money under the agreement that the note should be paid when due, and Barth thereby collected the debt which Henry owed him through the transfer and pretended sale of the improvement company's property by Henry. That this is the history of the transaction is very evident from Mr. Barth's testimony, who says:

" Q. Well state Mr. Barth what was done, what papers were exchanged at the time you got this note?

" A. At the time that I gave up the patent, these six mortgages were turned into my hand with Mr. Aldrich's note for ninety days.

" Q. Were the quitclaim deeds delivered at that time?

" A. I laid them out and signed them.

" Q. At the same time?

" A. Yes; I had seen Mr. Aldrich though first regarding that note, and instructed him and said: ' Will you be there and pay this note in ninety days,' and he said he would, it might be a little longer, but not very much longer.

" Q. Mr. Barth, when you make a loan and have security, are you in the habit of giving up that security before you get some other security, if your note is not paid?

" A. Not apt to.

" Q. Did you do it in this instance?

" A. I don't remember that I did.

" Q. Then if the quitclaim deeds are dated June 22, you are sure that you did not deliver them until this note was delivered to you?

" A. I am under the impression that I took them in a straight way, that is: ' Here's your security, and here's mine.'

" Q. Then Mr. Barth, at the time that you took this note from Mr. Aldrich and delivered the patent and the quitclaim deed if you think that is the way you did it, did you have any talk with Mr. Aldrich?

" A. I had no talk with him, except the assurance that he would pay the note in ninety days, or shortly afterward.

" Q. Was anything said at that time about the patent, or the certificate of purchase from the state?

" A. No.

" Q. You do not remember that either Aldrich or yourself talked with reference to the patent?

" A. I was delivering up the patent and taking this, with the assurance that that note would be paid in ninety days, or perhaps shortly afterwards.

" Q. What did you do with the original certificate from the state ?

" A. I gave it to T. C. Henry.

" Q. The certificate ?

" A. Yes, sir. I think so.

" Q. Did you have the certificate at the time you exchanged?

" A. I mean the patent, not the certificate ; that I had to return to the state.

" Q. You do not remember whether anything was said between you and Aldrich about the certificate ?

" A. No, I do not know that there was."

There is quite a discrepancy between the consideration as stated in the pleadings, and that which is attempted to be given by Mr. Aldrich in his testimony. In one place it is stated at $9,600, but the amount of Henry's debt to Barth and the Hill acceptances was $11,800, while Aldrich states that the exact amount paid was thirteen times $1,250, that being the exact number of the trust deeds involved in the transaction. We are quite indifferent whether it was $9,600 or $16,000 ; the result is the same in either case, and although it makes the securities company's loss greater in the one case, it in no manner affects the equities or rights of the parties, but we refer to it because we find in this examination of Mr. Aldrich another reason for believing that he was not at all an innocent purchaser, and knew that he was dealing with the improvement company's property and getting trust deeds and notes in such a manner that he would be chargeable with notice of any infirmities which might attach to them, because when he is asked to explain the difference between $9,600, $11,800, and $16,000, and where the difference went to, he proceeds to state in an indefinite way that part of it was a settlement of some other matters with Mr. Henry, and part of it went to Henry in cash. It will thus be seen that the securities company was dealing with this property and paying the consideration not to the company itself, or to any person who had apparent or actual corporate authority to receive it, but he was paying an individual's debt, collecting

debts apparently due to the securities company from the same individual, and likewise giving him some cash in pursuance of some bargain in reference to it. We have thus very fully narrated the history of this transaction because it is a better argument to support the proposition about which there can be no question, than any authorities which we might cite.

It would, of course, be quite possible to lay down sundry legal propositions respecting the character of quitclaim deeds, and the lack of consideration as affecting the knowledge of a party dealing with the title and as charging him with notice of the defective character of the title he is purchasing. We prefer, however, to put our decision on the broad ground that the evidence in this case discloses beyond question that there was enough in the transaction to charge Aldrich and the securities company with full notice and actual knowledge of the lack of title and the want of equity in the grantors from whom they seek to deraign their title. We are not, however, left to depend wholly on the deductions from this proof, because there is enough direct evidence of actual knowledge communicated to Aldrich and therefore to the securities company of this outstanding equitable title which vested in DeLong and Brower. We are very frank to say that we do not credit Mr. Aldrich's testimony. It does not bear the marks of truth on its face, and is not a fair, open and honest statement of the transaction as it occurred. When other witnesses who were totally unattacked and without interest state actual notice to him of the outstanding title of the improvement company, we prefer to accept that evidence as true, and as a sufficient basis on which to support the judgment.

This argument might of course be supported by the suggestion that since the certificate on its face recited the title of the improvement company the securities company was without right to rely on it, especially when we remember that for years the improvement company or its predecessors had been in possession of the property and making extensive improvements on it, and that whatever knowledge is brought

home to an intending purchaser from these circumstances must be held in the contemplation of law to have been within the knowledge of the purchaser.

The whole case, however, exhibits so very clearly an attempt to deal with the property of a corporation without right and without authority, and under circumstances which obligated the securities company to take notice of the character of the title with which they were dealing and which charges them not only with the knowledge and the information which they had, but with that which they might have acquired by the exercise of reasonable prudence and care, that we must conclude from the entire case as we have stated it, the equity of the securities company is neither prior in time nor prior in right to that which is asserted and well established by DeLong and Brower.

The *Stewart* case is broad authority to the proposition that DeLong and Brower having such equities and rights may maintain a bill and compel the holders of the legal title to convey to them as the holders of the prior and superior equities. The judgment of the court below was right, and to that extent will be affirmed. It must of necessity be modified, although on a different ground than the one suggested in the argument. The bill as filed recited the fact that Barth had paid $1,292.80, as the last payment due the state under the certificate of purchase and in order to acquire legal title, and the plaintiff therefore tendered to Mr. Barth $1,500, being the amount of that sum and interest which they offered to bring into court and to pay to his successors, the securities company, on the execution of the deed, if the decree should so order. In the argument it was discussed as a tender, and it was urged that in any event the plaintiff in error was entitled to a judgment for that sum. We do not put our decision on the basis of a tender, but on the very broad basis that when the plaintiff filed the bill against the defendants to compel the conveyance of the legal title, they could manifestly only be entitled to such a decree on the payment of whatever sum the defendants or any of

them might have paid to the state in order to acquire the legal title which the plaintiffs sought to acquire. It seems to be conceded by both bill and answer that this amount was the sum which Mr. Barth paid to the state in order to get the patent, and since DeLong and Brower are seeking to compel a conveyance of that legal title, it is manifestly only right that they should be compelled to reimburse the holders of the patent for the sum which they were compelled to pay to procure it. This is regardless of all equities as between the parties, and we can discover nothing in the circumstances which would relieve those defendants in error from that obligation. We shall therefore affirm the decree with a modification that the defendants pay the sum which Mr. Barth paid to the state with interest to date unless it shall transpire that a tender has been made and kept good, which may possibly relieve them of the liability to pay part of the interest suggested,—if this be true an application to modify will be entertained.

Except as modified the decree of the court below is right, and it will accordingly be affirmed.

*Modified and affirmed.*

WILSON, J., not sitting.